05-5255-cr(L)
United States v. Rodriguez (Todd)

AMENDED OPINION

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2007

Argued: May 12, 2008                                  Decided:  June 5, 2008
Amended: July 1, 2008

Docket Nos. 05-5255-cr(L); 05-5258-cr(con); 05-5260-cr(con); 05-7023-cr(con);
06-1210-cr(con); 06-1219-cr(con); 07-2966-cr(con)

_____

UNITED STATES OF AMERICA,

Appellee,

v.

PAUL THOMPSON, TYRONE KINDRED, DAMION HENRY, STEPHEN REID,

Defendants,

TAI TODD, OTIS FISHER, JUNIOR ROBINSON, JASON ROSE, RICARDO RODRIGUEZ,

Defendants-Appellants.

_____

Before: FEINBERG and MINER, Circuit Judges.[1]

Appeals from judgments of conviction and sentence entered on September 27, 2005, December 27, 2005, and July 2, 2007 in the United States District Court for the Southern District of New York (Scheindlin, J.) convicting defendants-appellants for various offenses related to a narcotics trafficking conspiracy and (except as to Todd) the use and possession of firearms in connection therewith. Before us on appeal are challenges to the seating of the jury, including a reverse-Batson challenge; sufficiency of the evidence; the introduction of a tape recording of an

---

[1] Judge Peter W. Hall, originally a member of the panel, recused himself subsequent to oral argument. Because the remaining members of the Panel are in agreement, we have decided this case in accordance with § 0.14(b) of the rules of this Court.

attempted sale of crack; certain evidentiary rulings; the alleged withholding of <u>Brady</u> material; a finding of competency to stand trial; and sentencing.

The judgment of the District Court is affirmed with respect to the convictions and remanded in accordance with <u>United States v. Regalado</u>, 518 F.3d 143 (2d Cir. 2008) (per curiam), with respect to the sentence imposed on defendant-appellant Fisher.

ELLYN I. BANK, New York, New York, <u>for Defendant-Appellant</u> Tai Todd.

TIMOTHY J. MCINNIS, Law Office of Timothy J. McInnis, New York, New York, <u>for Defendant-Appellant</u> Jason Rose.

FRANCISCO E. CELEDONIO, Law Office of Francisco E. Celedonio, New York, New York, <u>for Defendant-Appellant</u> Otis Fisher.

STEVEN A. FELDMAN, Feldman and Feldman, Uniondale, New York, <u>for Defendant-Appellant</u> Junior Robinson.

MARTIN J. SIEGEL, Law Office of Joshua L. Dratel, New York, New York, <u>for Defendant-Appellant</u> Ricardo Rodriguez.

LAURIE A. KORENBAUM, Assistant United States Attorney (Celeste L. Koeleveld, Assistant United States Attorney, <u>on the brief</u>), for Michael J. Garcia, United States Attorney, Southern District of New York, New York, New York, <u>for Appellee</u>.

PER CURIAM:

Defendants-appellants, Tai Todd, Jason Rose, Otis Fisher, Junior Robinson, and Ricardo Rodriguez (collectively, the "Defendants"), appeal from judgments of conviction and sentence entered, following a jury trial, in the United States District Court for the Southern District of New York (Scheindlin, <u>J.</u>) on September 27, 2005 (Todd, Fisher, and Robinson), December 27, 2005 (Rose), and July 2, 2007 (Rodriguez). Todd was convicted of one count of conspiracy to

2

possess with intent to distribute between 5 and 50 grams of cocaine base and an unspecified amount of marijuana, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A) and 841(b)(1)(D). The remaining Defendants were convicted of conspiracy to possess with intent to distribute 50 grams or more of cocaine base as well as an unspecified amount of marijuana and of using and possessing firearms in furtherance of the conspiracy, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924 (c)(2). The District Court sentenced Todd to a term of imprisonment of 60 months and Fisher to consecutive terms of imprisonment totaling 211 months. The remaining Defendants each received consecutive sentences totaling 300 months. Before us on appeal are challenges to the seating of the jury, including a reverse-Batson challenge; sufficiency of the evidence; the introduction of a tape recording of an attempted sale of crack; certain evidentiary rulings; the alleged withholding of Brady material; a finding of competency to stand trial; and sentencing. For the reasons that follow, we affirm the Defendants' convictions and remand to the District Court for reconsideration of the sentence imposed on defendant Fisher in accordance with United States v. Regalado, 518 F.3d 143 (2d Cir. 2008) (per curiam).

**BACKGROUND**

The evidence at trial established that between 1998 and 2003, Rodriguez and Thompson ran a crack cocaine and marijuana distribution organization that operated in the Bronx and Vermont. Rodriguez and Thompson were the organizers and leaders of the organization, which sold its crack and marijuana on the streets and from inside various stash houses. Rose, Fisher, Robinson, and Todd helped manage the operation and sold its crack cocaine and marijuana. Members of the conspiracy used, carried, and possessed firearms in furtherance of the crack cocaine and marijuana conspiracy.

3

The Government's proof included the testimony of cooperating witnesses who worked for or with Rodriguez and Thompson between 1998 and 2003 in the Bronx and Vermont, as well as an independent and at times competing drug dealer who witnessed the operation of the drug organization in the Bronx. These witnesses described how and where the crack cocaine and marijuana distribution organization operated; the quantities of crack cocaine its members distributed; and the weapons its members used, carried, and possessed to protect the organization from rivals.

The testimony of the cooperating witnesses was corroborated by quantities of narcotics, cash, weapons, and narcotics paraphernalia seized from the organization's stash houses in the Bronx, as well as from the street and automobiles in the Bronx and Vermont. The Government also offered the testimony of officers from the New York City Police Department ("NYPD") Gang Squad, who observed the Defendants over a period of approximately five months selling, mostly in combination, crack cocaine and marijuana on East 228th Street in the Bronx.

## DISCUSSION

### I.

After jury selection the Government alleged, pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), that defense counsel's use of peremptory challenges during voir dire was racially motivated. In Batson, the Supreme Court prohibited prosecutors from exercising peremptory challenges to prospective jurors based on race. Id. at 87 ("[B]y denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror."). The Supreme Court later extended Batson, prohibiting defense counsel from exercising racially motivated peremptory challenges. See Georgia v. McCollum, 505 U.S. 42, 59

4

(1992). An accusation by the Government that defense counsel has engaged in such discriminatory conduct has come be known as a "reverse-<u>Batson</u>" challenge.

Here, the District Court granted the government's reverse-<u>Batson</u> challenge and re-seated Juror Two. In assessing a party's claim that its opponent has exercised its peremptory challenges in a discriminatory manner, a trial court engages in a three-step analysis, under which the court must: (1) determine whether the moving party has made a <u>prima facie</u> showing that the other party has exercised a peremptory strike on the basis of race; (2) if so, decide whether the party exercising the challenged strike has satisfied the burden of offering a race-neutral explanation for the strike; and (3) if so, make a determination whether the challenging party has carried his burden of proving purposeful discrimination. See <u>Batson</u>, 476 U.S. at 96–98. We have held that the third step of the <u>Batson</u> inquiry requires a trial judge to make "an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." <u>United States v. Alvarado</u>, 923 F.2d 253, 256 (2d Cir. 1991). We have also held that "the ultimate question of discriminatory intent represents a finding of fact that will be set aside only if clearly erroneous." <u>United States v. Taylor</u>, 92 F.3d 1313, 1326 (2d Cir. 1996).

During jury selection, the defense exercised fourteen peremptory challenges, twelve of which were against white jurors and two of which were against Latino jurors. Sixty-five percent of the original members of the panel were white. In response to the Government's reverse-<u>Batson</u> challenge, the District Court determined that there was a <u>prima facie</u> case of discrimination because over 85% of the challenges exercised by defense counsel were against white jurors while no challenges were exercised against African American jurors. After a hearing at which the defense was given an opportunity to offer race-neutral reasons for its

peremptory challenges, the District Court re-seated Juror Two. Defense counsel offered the following race-neutral reasons for exercising the challenge against Juror Two: (1) the brother of Juror Two's fiance was a police officer; (2) she was a long-term resident of Westchester County (Yonkers); (3) she lives with her parents and presumably was "sheltered"; and (4) she taught second grade at a school in the Bronx. The District Court doubted the defense's theory that Juror Two would be influenced by the fact that her future brother-in-law was a police officer in a small town. Moreover, the District Court doubted the relevance of Juror Two's position as a teacher in the Bronx because an African American juror who also had been a teacher in the Bronx, Juror Thirty, was seated with no challenge from the defense. The District Court stated: "Other than race, I really don't see a legitimate difference between [Juror Thirty], who spent a career teaching kids in the Bronx, who[m] you chose to keep, and [Juror Two]. . . . That is why I think [Juror Two] is the weakest of the challenges."

The Defendants argue that their proffered reasons for the strike were legitimate and sufficient to allow the peremptory challenge of Juror Two to stand. While it is true that the District Court generally considered certain of the proffered reasons as applied to other defense strikes to be sufficiently race-neutral, the court rejected those reasons as pretext for actual discrimination in the challenge of Juror Two. This Court gives deference to a district court's determination as to whether proffered reasons for a peremptory strike are pretextual, and in this case nothing in the record suggests that the District Court's findings were clearly erroneous.

With regard to the fact that Juror Two's fiance's brother is a police officer, the court noted that Juror Two herself did not emphasize that fact — she had only mentioned it in response to the court's question about contacts with law enforcement. The District Court called Juror Two

6

back into the box to question her further, and Juror Two explained that she did not think her future brother-in-law's line of work would affect her, in part because she never talked about his work with him. Moreover, the District Court observed that the defense had seated a Latino juror whose brother was a retired undercover police officer. The court noted: "[D]efense has to be cautious. If they start saying somebody has a lot of friends in the NYPD, well, if seated jurors have a lot of friends in the NYPD, it kind of drops away as a reason for the strike."

With regard to Juror Two's county of residence, the District Court found that, although it had accepted residence in Westchester County as a legitimate basis for challenges, Juror Two's residence in Yonkers was not equally legitimate because, as defense counsel had conceded, Yonkers is more like the Bronx than Westchester. Moreover, the defense had seated two Latino jurors from Westchester. The court also did not find, based on its observation of her, that Juror Two seemed "sheltered." Finally, the District Court did not find credible the defense's concerns with Juror Two's occupation as a school teacher in the Bronx, primarily because the defense seated an African American juror who also had been a school teacher in the Bronx for many years before retiring.

The District Court made "an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances," Alvarado, 923 F.2d at 256, and we find no error in the District Court's determination. See Snyder v. Louisiana, 128 S. Ct. 1203, 1210–11 (2008) (finding that prosecutor's facially implausible explanation for challenging an African American juror based on juror's conflicting obligations was "reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as" [that of the challenged juror]).

7

The Defendants also claim that the District Court failed to make an explicit determination that the defense had exercised the peremptory challenge in an intentionally discriminatory manner. The purpose of this Court's requirement that a district court make explicit findings with respect to each of the three steps prescribed in Batson is to avoid an incomplete record that will prevent "a meaningful determination on the question whether the challenges demonstrated discriminatory intent." Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000). In this case, the District Court elicited the Defendants' explanations for the peremptory challenge of Juror Two, examined those explanations through questioning and colloquy, and stated on the record that it found the explanations not credible and "weak." Accordingly, the District Court's finding of purposeful discrimination and the record supporting that finding are sufficient to allow this Court's review of the issue.

The Defendants further claim that because they exercised their peremptory challenges as a group, the District Court could not properly discern whether an individual Defendant had acted with discriminatory intent. In raising this claim, however, the Defendants overlook the fact that after the Government raised its reverse-Batson challenge, each defense counsel was permitted to offer race-neutral reasons for the strike. The record demonstrates that more than one defense counsel offered an explanation for the strike, and there is no evidence that any attorney was prohibited from participating in the District Court's examination of the strike. Batson "was designed to serve multiple ends, only one of which was to protect individual defendants from discrimination in the selection of jurors. . . . Batson . . . is designed to remedy the harm done to the dignity of persons and to the integrity of the courts." McCollum, 505 U.S. at 48 (internal quotation marks omitted). The Supreme Court has recognized that "denying a person

8

participation in jury service on account of his race unconstitutionally discriminates against the excluded juror." Id. In this case, the District Court properly evaluated the reasons given by each Defendant who argued in support of the peremptory challenge before arriving at its finding of discriminatory intent.

Finally, the Defendants argue that "a black criminal defendant should not be subject to a Batson challenge for exercising his peremptory strikes with respect to white jurors" because "the potential social harms identified in 'race-related' cases involving racial minorities . . . are not implicated" where an African American defendant seeks to strike white jurors from the jury panel. This argument must be rejected in light of McCollum, which held that a defendant's discriminatory use of a peremptory challenge violates the equal protection right of the challenged juror. See 505 U.S. at 49 ("Regardless of who invokes the discriminatory challenge, there can be no doubt that the harm is the same — in all cases, the juror is subjected to open and public racial discrimination."); see also Powers v. Ohio, 499 U.S. 400, 407 (1991) ("[A] member of the community may not be excluded from jury service on account of his or her race."). Accordingly, the Defendants' argument that Batson does not apply where an African American defendant seeks to eliminate white jurors is entirely without merit.

## II.

Each of the Defendants challenges the sufficiency of the evidence in support of his conviction. This Court has noted that "[a] defendant who seeks reversal of his conviction on the ground of insufficiency of the evidence bears a heavy burden." United States v. Concepcion, 983 F.2d 369, 382 (2d Cir. 1992). In considering a defendant's challenge to the sufficiency of the evidence in support of his conviction, this Court reviews the evidence in the light most favorable

9

to the Government and draws every inference in the Government's favor. See United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998) (per curiam). The jury's verdict "must be sustained if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation marks omitted). In this case, the evidence presented at trial when viewed in the light most favorable to the Government was sufficient to support the convictions of each of the Defendants.

Todd, Rose, and Fisher argue that the Government presented insufficient evidence that they participated in the conspiracy alleged in the indictment. The analysis of this issue is two-fold. First, this Court asks whether the Government proved the defendant's intent to engage in the charged scheme. See United States v. Reyes, 302 F.3d 48, 53 (2d Cir. 2002). Second, we ask whether the Government proved that the defendant had some knowledge of the unlawful aims of the conspiracy. Id. In this case, the record is replete with evidence that would have permitted the jury to determine that Todd, Rose, and Fisher each intended to engage in the conspiracy and were also fully aware of its unlawful aims. With respect to Todd, two cooperating witnesses testified that he frequently sold crack cocaine in the vicinity of East 228th Street in the Bronx. One witness testified that Todd performed "hand-to-hand" sales after receiving packages of crack cocaine from Thompson and Rodriguez. Another witness testified that he had observed Todd selling crack cocaine with Thompson and Rodriguez. Law enforcement officers testified that Todd functioned as a "look out" during at least one narcotics sale by members of the conspiracy, that in January 2003 he was arrested with Rose and Rodriguez after selling crack cocaine to an undercover officer, and that Todd's cell phone directory contained the telephone numbers of the other members of the conspiracy.

Rose argues that the Government failed to demonstrate that his conduct amounted to anything more than isolated sales of narcotics unrelated to the conspiracy alleged in the indictment. The evidence at trial, however, viewed in the light most favorable to the Government, permitted the jury to conclude that Rose sold narcotics with the other members of the conspiracy. Police officers testified that in September 2001 Rose and Robinson sold crack to an undercover officer and that in January 2003 Rose was arrested with Todd and Rodriguez after selling crack to an NYPD detective. Officers also testified that Rose was observed with Rodriguez and Robinson in front of one of the conspirators' stash houses on East 228th Street in the Bronx and that Rose was seen exchanging small objects for money on East 228th Street shortly after speaking with Rodriguez.

The evidence at trial was also sufficient to demonstrate that Fisher participated in the conspiracy. A police witness testified that Fisher was arrested in April 2001 for selling crack to an undercover officer on East 228th Street. A cooperating witnesses testified that Fisher gave money to and received drugs from Rodriguez and Thompson on a daily basis. Another cooperating witness testified that Fisher, along with other members of the conspiracy, moved the operation from the Bronx to her home in Vermont. On appeal, Fisher challenges the credibility of the cooperating witnesses. However, in assessing whether there was sufficient evidence to support a defendant's conviction, this Court "will not attempt to second-guess a jury's credibility determination." United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006). Accordingly, Fisher's challenge to the credibility of the prosecution's witnesses presents no basis to disturb the District Court's judgment in this case.

Rose and Fisher also argue that there was insufficient evidence to support the jury's

11

determination that they were responsible for distributing more than 50 grams of crack cocaine. This Court has determined that, where an indictment alleges a conspiracy involving the weight-related provisions of 21 U.S.C. § 841, the Government's burden of proof "includes the requirement that a co-conspirator defendant at least could have reasonably foreseen the type and quantity of the substance about which [he] conspired." United States v. Adams, 448 F.3d 492, 500 (2d Cir. 2006). Here, there was sufficient evidence for the jury to conclude that Rose and Fisher could have reasonably foreseen that the conspiracy would involve distribution of more than 50 grams of crack cocaine. There was ample testimony describing frequent narcotics sales by members of the conspiracy, and witnesses testified that Rose and Fisher participated in daily sales of numerous small packets of crack cocaine.

Rose, Rodriguez, and Fisher also challenge the sufficiency of the evidence supporting their convictions under 18 U.S.C. § 924 for use of firearms in furtherance of the narcotics conspiracy. In order to sustain a conviction under 18 U.S.C. § 924, the Government must demonstrate "some nexus between the firearm and the drug selling operation." United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001). We have noted that "[u]ltimately, the test is whether a reasonable jury could, on the evidence presented at trial, find beyond a reasonable doubt that possession of the firearm facilitated the drug trafficking crime . . . ; 'in furtherance' means that the gun afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." United States v. Lewter, 402 F.3d 319, 322 (2d Cir. 2005). In Lewter, we concluded that "[p]ossession of a firearm to defend a drug stash clearly furthers the crime of possession with intent to distribute the contents of that stash." Id.

In this case, cooperating witnesses testified that there were weapons in at least two of the

12

locations where the members of the conspiracy stored and prepared the narcotics. There was evidence in the record that the Defendants carried weapons during narcotics sales on East 228th Street and that they hid numerous firearms in the vicinity of the locations where they sold crack cocaine. One witness testified that he had observed Rose retrieve hidden weapons on two occasions when the conspirators expected violence from rival drug dealers. Police testimony described Fisher stashing a handgun in a trash can near where he sold crack cocaine. Witness testimony connected Rodriguez to several weapons and described him firing a weapon into the air in response to a competitor's sale of crack cocaine on East 228th Street. The evidence created the permissible inference that the members of the conspiracy possessed and used firearms in furtherance of the drug distribution alleged in the indictment.

## III.

Rose alleges that the Government violated his Fifth Amendment rights by introducing into evidence the tape recording of an attempted crack cocaine sale between Rose and an undercover police officer during which the officer allegedly gave Rose alcohol and Rose became intoxicated. We review a district court's evidentiary decisions for abuse of discretion. See United States v. Schultz, 333 F.3d 393, 415 (2d Cir. 2003). Although this Court has not addressed the issue of whether a defendant's intoxication renders his statement inadmissible, one court in this Circuit has determined, in the context of a habeas petition, that where a defendant's intoxication is police-induced, his statement is "automatically excluded." Davis v. Bara, 542 F. Supp. 743, 747 (E.D.N.Y. 1982). However, the District Court found no conclusive evidence that the undercover officer either provided Rose with the alcohol or induced his intoxication, and we find no error in the District Court's factual determination or abuse of discretion in its decision to

13

admit the tape of the conversation.

Rose also alleges that reversal is warranted by the cumulative effect of: evidentiary errors, prosecutorial misconduct during summation, the Government's use of witnesses who lacked credibility, and the Government's failure to timely disclose Brady material. According to Rose, the District Court erred in failing to grant his motion for a mistrial on the basis of these errors. With respect to the claimed evidentiary errors — witness testimony referring to his prior incarceration, the admission of "excessive" evidence of narcotics transactions not related to the charged conspiracy, and the display of his arrest photographs to the jury — the trial transcript demonstrates that the District Court provided appropriate limiting instructions to the jury. Further, the District Court offered a strong curative instruction addressing the Government's use of Rose's nickname "Murda" in its closing argument.

The record does not support Rose's claim that, during trial, a cooperating witness "blurted out" that Rose had participated in a shooting not charged in the indictment. While the witness did refer to a shooting that had occurred in August 2001, that witness did not name Rose or any other Defendant as the individual who had been involved in the shooting. Further, there is no merit to Rose's claim that the Government improperly relied on the testimony of witnesses who were not credible. It is well established that "[b]ecause the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Ferguson, 246 F.3d 129, 133–34 (2d Cir. 2001) (internal quotation marks omitted). Here, Rose has offered no evidence that the witnesses' testimony either was perjurious or "patently incredible or defie[d] physical realities"

14

to warrant a mistrial. United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

As to the alleged Brady violation, Rose fails to demonstrate that the information allegedly withheld by the Government was material to his defense as either exculpatory or impeachment evidence. See United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) ("Information coming within the scope of [Brady] includes not only evidence that is exculpatory . . . but also evidence that is useful for impeachment . . . ."). The purported Brady material included a detective's notes from interviews with two witnesses who both omitted Rose's name when discussing membership in a gang that members of the conspiracy belonged to. As the Government argues, membership in that gang was not a prerequisite for membership in the conspiracy. The other purported Brady material consisted of alleged statements by a cooperating witness that Rose had given crack cocaine to another individual in exchange for a gun. Rose fails to demonstrate how this alleged statement — which was neither written nor recorded and therefore not even considered a "statement" required to be disclosed pursuant to 18 U.S.C. § 3500 — was exculpatory. We find no basis to disturb the District Court's ruling that the information that was allegedly improperly withheld had no exculpatory or impeachment value.

IV.

Robinson argues that the District Court erred in dismissing a seated juror and replacing her with an alternate without further inquiry into the juror's explanation that she could not continue to serve at trial. Rule 24(c) of the Federal Rules of Criminal Procedure provides that a district court may "impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties." This Court has held that district courts have "broad discretion under [Rule 24(c)] to replace a juror at any time before the jury

15

retires if there is reasonable cause to do so, and a reviewing court will only find abuse of that discretion where there is bias or prejudice to the defendant." United States v. Purdy, 144 F.3d 241, 247 (2d Cir. 1998) (internal quotation marks omitted). Here, Robinson offers no evidence demonstrating that the District Court abused its discretion in substituting the juror with the alternate juror. The court explained that the juror had claimed that her "nerves [were] shot" and that she planned to seek medical attention. The substitution occurred at the beginning of the second day of a multi-week trial. Robinson points to no evidence that the substitution created bias or prejudiced his defense. Accordingly, this claim presents no basis for reversal in this case.

V.

Rodriguez argues that the District Court violated his Sixth Amendment rights by proceeding to trial where there was reasonable cause to believe that he was not competent to do so. It is well established that due process "prohibits the criminal prosecution of a defendant who is not competent to stand trial." Medina v. California, 505 U.S. 437, 439 (1992). The "[d]etermination of whether there is 'reasonable cause' to believe a defendant may be incompetent rests in the discretion of the district court." United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986). Here, Rodriguez points to reports of evaluations performed by Dr. Andrew Capruso, a neuropsychologist, as evidence that he was not competent to stand trial and that the District Court abused its discretion by failing to conduct a competency hearing prior to trial. Although Capruso concluded that at the time of trial Rodriguez lacked the capacity to rationally consult with his attorney and assist in the preparation of his defense, Capruso made that conclusion well after the trial had ended and based only on his review of Rodriguez's medical records and the descriptions of Rodriguez's behavior by his trial counsel. Prior to trial, two

16

psychologists, including one retained by the defense, concluded in reports provided to the District Court that Rodriguez was competent to stand trial. Each of these psychologists had examined Rodriguez at least twice before the trial commenced. We are not persuaded that the District Court had any reason to doubt the conclusions of these psychologists. Moreover, other than his own conclusory assertion, Rodriguez offers no evidence that the District Court should have realized at some point during trial that Rodriguez had become incompetent to proceed. Accordingly, this claim presents no basis to direct a new trial in this case.

VI.

After all of the parties had filed their briefs in this Court, the Supreme Court issued Kimbrough v. United States, — U.S. —, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007), where it held that district courts "may consider the disparity between the Guidelines' treatment of crack and powder cocaine offenses" in deciding if a sentence is greater than necessary to achieve the goals of sentencing. Id. at 564. All of the defendants, with the exception of Fisher, were sentenced to statutorily mandated minimum sentences. Fisher's sentence exceeded the statutory minimum by 31 months. Accordingly, pursuant to Regalado, we must remand defendant Fisher's sentence so that the District Court can determine whether it would have imposed a non-trivially different sentence had it understood the full scope of its authority.

VII.

For the foregoing reasons, we affirm the judgment of the District Court as to the convictions of Defendants, and we remand defendant Fisher's sentence for further proceedings consistent with Regalado.

17